Kenneth P. STOLLER, Plaintiff,

v.

COLLEGE OF MEDICINE, the Milton S. Hershey Medical Center of the Pennsylvania State University, et al., Defendants.

Civ. No. 81–0360.

United States District Court, M.D. Pennsylvania.

April 25, 1983.

Thomas B. Schmidt, III, Harrisburg, Pa., for plaintiff.

R. Mark Faulkner, State College, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

Plaintiff Kenneth P. Stoller filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants the College of Medicine of the Milton S. Hershey Medical Center (the College of Medicine), a division of the Pennsylvania State University, Cheston M. Berlin, M.D., Nicholas M. Nelson, M.D., Harry Prystowsky, M.D., and John A. Waldhausen, M.D. on March 18, 1981. Jurisdiction of this Court is based on 28 U.S.C. §§ 1331(a), 1332 and 1343(a). In this lawsuit, Stoller challenges the decision of the Defendants to dismiss Stoller from the College of Medicine. Stoller alleges that the decision to dismiss constituted an arbitrary and capricious act in violation of Stoller's substantive due process rights. Stoller further contends that the manner in which he was dismissed constitutes a violation of his procedural due process rights.

This action was originally scheduled on the Court's March 1982 trial list. On February 23, 1982, Plaintiff Stoller filed a motion for a continuance, asserting that settlement negotiations were in progress and that the parties had reason to believe that a settlement would be achieved. The Court therefore continued the matter to the July 1982 trial list. The final pre-trial conference was held in this case on July 6, 1982. At that time, the Court determined that the case would be heard non-jury and that the case would be bifurcated as between liability and damages. As a result of the unanticipated length of several trials, one of which took 68 trial days on one issue of liability, the Court was compelled on several occasions to continue this case. The Court heard the matter non-jury on Friday, March 25, 1983. Following are the Court's findings of fact, discussion and conclusions of law in the liability phase of this trial.

### II. Findings of Fact.

1. Plaintiff is Kenneth Stoller. (Undisputed, hereinafter "U")

2. Defendant Harry Prystowsky is dean of the College of Medicine of the Pennsylvania State University and professor of obstetrics and gynecology. (U)

3. Defendant Nicholas M. Nelson is professor of pediatrics and chairman of the Department of Pediatrics of the College of Medicine. (U)

4. Defendant Cheston M. Berlin, Jr. is professor of pediatrics and pharmacology and assistant dean for student affairs of the College of Medicine. (U)

5. Defendant John A. Waldhausen is professor of surgery and chairman of the Department of Surgery of the College of Medicine. (U)

6. The College of Medicine is one of the academic units of the Pennsylvania State University and is located at the Milton S. Hershey Medical Center in Hershey, Pennsylvania. The Medical Center includes a teaching hospital and other academic programs in addition to the course of instruction leading to the Doctor of Medicine degree. (U)

7. Kenneth Stoller enrolled in the College of Medicine in the fall term of 1976, in the Doctor of Medicine degree program. (U)

8. The bulletin of the College of Medicine for the 1976–77 academic year provides as follows:

REQUIREMENTS FOR THE M.D. DEGREE

1. Satisfactory completion of the required basic science curriculum.

2. Evidence that the student has mastered the approach to the patient, using clinical skills and relying on a solid background in the basic sciences, as documented by successful completion of the clerkship program.

3. Completion of a problem-solving project prior to graduation. The project, done in association with either a clinical or pre-clinical faculty member, is an exercise in the use of the scientific method, including statement of the problem, design of a protocol, and collection and evaluation of data. This exercise is intended to help each student to develop a capacity for clinical thinking and to understand the nature of the research process and the limitations and variability of data.

At any time prior to the second term of the third year, the student will select a topic for such a project and submit an outline of the proposed work to the problem-solving subcommittee of the curriculum committee. Prior to the third term of the senior year, the project will be completed in writing and approved by the committee. Occasionally, prior work as an undergraduate or graduate student may qualify the student for exemption from this project. The student may petition for such an exemption by submitting prior work to the problem-solving subcommittee.

4. Satisfactory completion of electives approximately equivalent to three academic terms. These may be selected from any of the disciplines represented on the faculty but must include 5 credits in humanities. An elective in primary or ambulant care is strongly recommended.

5. National Board Examinations, Parts I and II, taken and passed. (U)

9. The College of Medicine curriculum requires four years of study for completion. (U)

10. The first two years of the curriculum consist principally of academic courses in a variety of areas which form the foundation of clinical medicine. (U)

11. The third and fourth years of the curriculum consist of clerkships served in specific areas of clinical medicine: medicine (12 weeks); surgery (12 weeks); obstetrics and gynecology (8 weeks); psychiatry (4 weeks); neurology (4 weeks); pediatrics (8 weeks); and elective clerkships selected by the student. (U)

12. A grade of honors, pass or fail is awarded for each academic course and clerkship. A grade is to be assigned to a student solely on the basis of the instructor's judgment as to a student's scholastic attainment. (U)

13. The bulletin of the College of Medicine for the 1976–77 academic year provides as follows:

The Promotion Committee, acting for the entire faculty, regularly evaluates the progress of each student. If a student is experiencing academic difficulty, this committee may recommend to the Dean of the College of Medicine, through the Office of the Assistant Dean for Student Affairs, one of the following courses of action:

1. Restructuring of the student's curriculum, with lightening of the academic load and the acquisition of tutorial help.

2. Repetition of the course, or, in the case of multiple failures, the entire year.

3. Suspension, to allow the student to reorganize his future in the absence of academic pressure.

4. Dismissal, when in the opinion of the faculty the student cannot master the material necessary for promotion. A recommendation for dismissal is made directly to the Dean of the Promotion Committee. The Dean, as chief executive officer for the College of Medicine, has the ultimate responsibility for implementing this decision. (U)

14. The promotions committee for the first two years of the Medical School curriculum (Promotions Committee I) is comprised of the department heads of each academic department. The promotions committee for the third and fourth year of the curriculum (Promotions Committee II) is comprised of the chairmen of each clinical department. (U)

15. In the fall term of 1976, Mr. Stoller failed microbiology 556 (microbial genetics). (U)

16. On December 1, 1976, Promotions Committee I met and reviewed Mr. Stoller's failure in microbial genetics, and placed Mr. Stoller on academic probation. (U)

17. On or about December 2, 1976, Mr. Stoller was notified by Dr. Berlin that he had been placed on academic probation. (U)

18. In the winter term of 1977, Mr. Stoller failed biochemistry 505 (biological chemistry II). (U)

19. On March 15, 1977, Promotions Committee II reviewed Mr. Stoller's failure of biological chemistry II and, noting that Mr. Stoller was then on academic probation, agreed that he would be interviewed by the Committee. (U)

20. On March 24, 1977, Promotions Committee I interviewed Mr. Stoller with respect to his failure in biological chemistry II. Dr. Howard Morgan, chairman of the Committee, indicated to Mr. Stoller that the Committee would review his spring term progress and evaluate his academic standing, and that a recommendation for dismissal could result in the event of insufficient improvement. (U)

21. On June 8, 1977, following completion of his spring term 1977, Promotions Committee I reviewed Mr. Stoller's performance for the academic year and decided that Mr. Stoller could enroll for a full second year schedule but would be required to repeat the two courses he had failed in his first year. Mr. Stoller was to remain on academic probation. (U)

22. On or about June 9, 1977, Mr. Stoller was advised of the decision of Promotions Committee I. (U)

23. During the summer of 1977, Mr. Stoller participated in a praeceptorship at a Family Medicine Clinic in Arizona, through the Family Medicine Department at the Medical Center. (U)

24. Promotions Committee I met and considered Mr. Stoller's performance on one occasion during the second year curriculum, following the conclusion of the winter 1978 academic term. (U)

25. On March 7, 1978, Dr. Berlin, in his capacity as Associate Dean for Student Affairs, received a memorandum from Dr. David J. Hufford, Assistant Professor of Behavioral Science. (U)

26. In the March 7, 1978 memo, Dr. Hufford enclosed a copy of Mr. Stoller's final examination in a course entitled Behavioral Science 503, and then stated as follows:

Although this student was able to pass the exam, we are concerned about his responses to several questions. Such comments are not typically made by our students, and would seem to reflect very poorly on Mr. Stoller's discretion and judgment. We feel that this matter should be brought to the attention of the promotions committee and that you should be aware of this, since the issue seems to extend beyond the Department of Behavioral Science. (U)

27. Among the questions on the Behavioral Science 503 examinations, and the responses by Mr. Stoller, were the following:

Q: What are the possible causes and/or consequences of the following common features of pediatric death and dying:

\* \* \* \* \* \*

g. Terminal diagnosis—(ANSWER) Often elicits trips to Disneyland before kid deep sixes it—kidding aside, the cause of a terminal diagnosis of a malignant illness, its consequence is death.

Q: Explain what Wolfensperger means by "normalization"—(ANSWER) I tried to figure out when I read the handout—but I couldn't grasp the concept. It's just another pseudo-scientific sociological term which hides the real meaning of that which it was meant to indicate in a narcissist medical, anthropomorphic, cognitive and all around dumb question.—Prof. Irwin Cory (1968).

Q: Explain what Wolfensperger means by "good" versus a "bad" ideology?—(ANSWER) Look why are you making such a big deal about Wolfensperger? He wasn't even discussed in my class! The handout was sociological B.S. (U)

28. By memorandum dated March 8, 1978, Dr. Berlin advised Mr. Stoller as follows:

> The Promotions Committee met on March 7 to review your academic situation. You are on *ACADEMIC PROBATION* for previous academic difficulties. It was noted that you are marginally passing both Pathology and Pharmacology. Of much more serious concern to the Committee is your performance on the recent Behavioral Science examination. Because the attitude reflected by your performance on this examination is not consistent with the goals of this institution in educating physicians, the Committee is considering your dismissal from the College of Medicine. Please attend the Promotions Committee meeting on March 14 at 3:15 p.m. in the Physiology Conference Room, B400. You may bring your faculty advisor with you. (U)

29. Mr. Stoller also wrote a letter to Dr. Patershaul, the principal instructor in Behavioral Science 503, which stated as follows:

> Dear Dr. Pattishall [sic],
>
> If you would be so kind as to read this apology: Firstly, I feel it is important for me to express the fact that I had no malice or grievance against you or any other Behavioral Science faculty member. Secondly, although I was under great pressure last quarter (I was taking seven classes), this does not defend the grievous error of venting pent up emotions on your exam.
>
> Believe me when I say this has been a most invaluable lesson for me: Although you may consider my apology a mere afterthought, I can assure you I fully comprehend the gravity of this indefensible act—one which I never plan on repeating in any form.
>
> My most sincere apology of all,
> /s/ Kenneth Paul Stoller (U)

30. Following an interview with Mr. Stoller, Promotions Committee I voted to allow Mr. Stoller to continue in the spring term 1978, that he be advised to discontinue all research activities and that his status be reevaluated after the spring term.

31. Mr. Stoller was advised of the action of Promotions Committee I by memorandum dated March 15, 1978, from Dr. Berlin, which provided as follows:

> The Promotions Committee met on March 14 to review your academic situation. You were reviewed along with your advisors, Drs. Waldhausen and Kales. The Committee has decided that you devote full-time to your academic activities and you are instructed TO PURSUE NO FURTHER RESEARCH. Furthermore, you are instructed to meet on a regular basis with your advisors, Dr. Waldhausen and Dr. Kales for counseling to overcome the apparent deficiencies in your preparation to assume professional responsibilities. Please be advised that you remain in *ACADEMIC PROBATION.* You may be dismissed from the College of Medicine should you again evidence failure to master the academic material and assume professional responsibility. (U)

32. On June 12, 1978, Promotions Committee I reviewed Mr. Stoller's performance for the second year curriculum and removed Mr. Stoller from academic probation. (U)

33. Mr. Stoller was advised of this action by a memo dated July 5, 1978, from Dr. Berlin, which stated as follows:

The Promotions Committee met on the 12th of June. They noted with satisfaction your recent successful completion of the curriculum. For next year, you will register and take a full third-year curriculum. You are hereby *removed from ACADEMIC PROBATION*. If at any time should you feel you are experiencing difficulty, contact the appropriate departmental member immediately. (U)

34. Mr. Stoller's third year curriculum was to consist entirely of clerkships in the various specialty fields of medicine: surgery, from June 12 through September 1, 1978; psychiatry from September 5 through September 29, 1978; neurology, from October 2 through October 27, 1978; obstetrics and gynecology from October 30 through December 22, 1978; pediatrics, from January 8 through March 2, 1979; and medicine from March 11 through May 19, 1979. (U)

35. At the conclusion of Mr. Stoller's surgery clerkship he was assigned a failing grade by the Department of Surgery. (U)

36. Dr. Thomas J. McGlynn, Jr., acting assistant dean for Student Affairs during Dr. Berlin's sabbatical, received notice of this failing grade from Dr. Waldhausen (chairman of the Department of Surgery), and on September 8, 1978, recommended to Dr. Graham Jeffries (chairman of the Promotions Committee) that Promotions Committee II review Mr. Stoller's record. (U)

37. On September 15, 1978, Promotions Committee II reviewed Mr. Stoller's performance in surgery and his previous academic history during the first two years of the curriculum. The committee decided to interview Mr. Stoller and notify him that he would be considered for possible dismissal from the College of Medicine. (U)

38. By memorandum dated September 15, 1978, Dr. McGlynn advised Mr. Stoller as follows:

The promotions committee met on September 15 to review your academic status. You have recently failed a major clerkship in the third year which the committee views most seriously. Because of your performance on this clerkship, the committee is considering your dismissal from the College of Medicine. Please attend the promotions committee meeting on Monday, September 18 at 2:30 p.m., in room V–600. You may bring a faculty advisory with you. (U)

39. At Mr. Stoller's request, the meeting of Promotions Committee II scheduled for Monday, September 18, 1978 was postponed until September 25, 1978, so that he could attempt to obtain a faculty advisory to replace Dr. Waldhausen. Stoller was not able to obtain a faculty advisory before the Promotions Committee II meeting.

40. The meeting of the Promotions Committee occurred on October 2, 1978. (U)

41. Promotions Committee II decided to place Mr. Stoller on academic probation until the successful completion of all of his currently scheduled required clinical clerkships and the repeat of the surgery clerkship.

42. By memorandum dated October 3, 1978, Dr. McGlynn advised Mr. Stoller as follows:

The Promotions Committee Years III and IV met on October 2 to interview you regarding your failure on the Surgery clerkship. Your performance was reviewed along with your advisor, Dr. Kales. Because you have failed a required clinical clerkship, the Committee has instructed you to repeat the surgery clerkship rotation beginning June 11—August 31, 1979. In addition, effective immediately you are placed on *ACADEMIC PROBATION* until you have successfully completed all remaining core clerkships and repeated the Surgical clerkship. Please be advised that any student in the College of Medicine who is on *ACADEMIC PROBATION* may be dismissed should he again show failure to master the academic material and/or assume professional responsibility. The Promotions Committee will monitor your academic progress. (U)

43. At the meeting when this memorandum was delivered to Mr. Stoller, Dr. McGlynn told him that Promotions Commit-

tee II would not tolerate a borderline performance in the future. (U)

44. Mr. Stoller received a passing grade in his next three clinical clerkships: psychiatry (September 5 through 29, 1978); neurology (October 2 through 27, 1978); and obstetrics-gynecology (October 30 through November 22, 1978). (U)

45. Mr. Stoller began his pediatrics clerkship on January 8, 1979. (U)

46. Approximately halfway through the portion of pediatrics clerkship served at Hershey Medical Center, Dr. Nelson advised Mr. Stoller that two residents had perceived weaknesses in his performance, and further advised Mr. Stoller to redouble his efforts during the segment of the clerkship to be served at Polyclinic Hospital.

47. Dr. Nelson received a number of written evaluations of Mr. Stoller's performance from physicians who had observed Mr. Stoller's performance during the Pediatrics clerkship.

48. The evaluations by the Department of Pediatrics staff of Mr. Stoller's performance for the Pediatrics clerkship, January 8 to March 2, 1979, were as follows:

(a) Dr. Dossett evaluated Mr. Stoller's performance from January 8, 1979 to February 4, 1979. Dr. Dossett assigned a grade of "Pass". Under the phrase "general comments" Dr. Dossett indicated "good clinical performance."

(b) Dr. Wassner submitted an evaluation form but did not provide an evaluation, noting that he had "no contact" with Mr. Stoller.

(c) Dr. Beausang submitted an evaluation form giving Mr. Stoller a grade "Low Pass." Dr. Beausang also indicated general comments that Stoller "needs to do a lot of work to catch up with his classmates in all aspects of his medical abilities. Definite doubts about his ability to be a physician. Disorganized. Seems to be uncertain about what to read, what was important, and what was not important. Did minimum amount of work." Dr. Beausang indicated that, while Mr. Stoller was in his third year of medical school, his performance in the pediatrics clerkship was at the level of a second year student.

(d) Dr. Sewell gave Mr. Stoller a grade of "Low Pass." Dr. Sewell gave Stoller unsatisfactory grades in the areas of thoroughness, availability, self-education, recall of knowledge, correlations of knowledge, ability to reach appropriate conclusions of clinical judgment, ability to form appropriate care plans and ability to take appropriate action. Dr. Sewell also provided general comments that Stoller had "[total] disinterest in pediatrics, procedures, and the program in general." Dr. Sewell also indicated that Stoller was a procrastinator, undependable, tardy, inconstant, and irresponsible.

(e) Dr. Bartlett gave Stoller a grade of "Pass."

(f) The neonatal intensive care unit (NICU) group gave Stoller a grade of "Pass" in the Pediatrics clerkship. As general comments, that group indicated that Stoller "tried hard. Improved during the week in NICU and became more involved. Knowledge average. Lacks confidence in verbal case presentation—needs practice."

(g) Dr. Warren evaluated Stoller's performance as "Low Pass." Dr. Warren indicated in his general comments that "Ken Stoller made it quite clear from the time that he arrived that he was interested in psychiatry. His performance on the ward was very weak. On nights when he has been 'on call' he was nowhere to be found. From close observation Ken was very unsure of himself with little confidence in his ability and seemingly little ability to be critical. In general, his fund of knowledge was not what I would expect of a student just completing two months of pediatrics." Dr. Warren found Stoller's performance unsatisfactory in the areas of availability, objectivity, professionalism, coping capability, and ability to draw appropriate conclusions and clinical judgment. Dr. Warren also found Stoller to be unrealistic, unsure, and meek.

49. At the staff meeting of the Department of Pediatrics on March 8, 1979 grades were assigned to all students in the Pedia-

tric clerkship for the period January 8 to March 2, 1979, with the exception of Mr. Stoller. Assignment of a grade to Mr. Stoller was deferred.

50. After Mr. Stoller inquired why he had not received a grade in Pediatrics, Dr. Nelson advised Mr. Stoller on April 5, 1979 that in view of the evaluations of his performance to that time, the Department had deferred conferring a final grade and would administer an oral examination to Mr. Stoller. Three members of the department, Drs. Ladda, Vannucci, and Wassner, were appointed to serve on the examination committee.

51. By memorandum dated April 12, 1979, Dr. Ladda advised Dr. Nelson of the results of that oral examination as follows:

On April 10, 1979, between 4:30 and 6:00 p.m., Drs. Vannucci, Wassner and I evaluated Ken Stoller's general knowledge of pediatrics. The topics included various aspects of normal and abnormal growth and development, immunizations, etiology of jaundice and problems in the physical examination of children.

The members of the examining committee agreed that Mr. Stoller's general fund of knowledge was adequate. However, he had difficulty correlating clinical observations and required considerable direction in selecting the appropriate pathway to a diagnosis. Although Mr. Stoller's performance was considered 'passable,' the committee suggests that Mr. Stoller may wish to elect to repeat the pediatric clinical clerkship in order to gain additional experience before continuing on into less structured elective clinical courses. (U)

52. Based upon the evaluations and Mr. Stoller's performance in the special examination, Dr. Nelson concluded that Mr. Stoller should be assigned a failing grade for the Pediatrics clerkship.

53. Although some evaluators used the phrase "Low Pass" to characterize Mr. Stoller's performance and the examination committee used the word "passable," in Dr. Nelson's judgment, the cumulative record of Stoller indicated an inadequate performance.

54. In Dr. Nelson's view, individual evaluators are unlikely specifically to recommend that a failing grade be assigned even where the record of the student is unsatisfactory.

55. By memorandum of April 16, 1979, to the Office of Student Affairs with copies to the members of the Department of Pediatrics and Mr. Stoller, Dr. Nelson advised that he had assigned Mr. Stoller a failing grade for the pediatrics clerkship.

56. To the best of his ability, Dr. Nelson assigned a grade to Mr. Stoller based solely on Mr. Stoller's unsatisfactory performance during the Pediatrics clerkship.

57. Dr. Nelson did not consider the fact that Mr. Stoller was on academic probation at that time or that failing pediatrics might result in Mr. Stoller's dismissal from the school.

58. By memorandum of April 19, 1979, Dr. Graham Jeffries, chairman of Promotions Committee II, advised Mr. Stoller as follows:

The promotions committee has received information today regarding your failure in pediatrics. Because of your performance on this clerkship, the committee is considering your dismissal from the College of Medicine. Please attend the promotions committee meeting on Wednesday, April 26 at 4:30 p.m., in Room B–600. You may bring a faculty advisor with you. (U)

59. Mr. Stoller sought the help of Dr. Paul Fairbrother and had several meetings with him in preparation for the meeting with Promotions Committee II. (U)

60. Mr. Stoller was aware that a possible outcome of the Promotions Committee II meeting was dismissal from the College of Medicine. (U)

61. Dr. Nelson reported on Mr. Stoller's performance in his Pediatric clerkship at the beginning of the meeting of Promotions Committee II on April 26, 1979. Mr. Stoller was then invited into the meeting and was interviewed. He did not hear Dr. Nelson's presentation.

62. Promotions Committee II voted in favor of the dismissal of Mr. Stoller with one opposing vote by Dr. Fairbrother and one abstention. (U)

63. By memorandum dated April 26, 1979, Dr. Berlin reported to Dr. Prystowsky that Promotions Committee II had voted to recommend that Mr. Stoller be dismissed for academic reasons. (U)

64. Mr. Stoller was advised unofficially by Dr. Fairbrother of the recommendation of Promotions Committee II. (U)

65. Dr. Prystowsky scheduled a meeting with Mr. Stoller a few days after the recommendation of Promotions Committee II was forwarded to Dr. Prystowsky. (U)

66. On April 30, 1979, Dr. Fairbrother delivered a letter to Dr. Prystowsky urging that Mr. Stoller not be dismissed from the Medical Center. (U)

67. After the recommendation of the Promotions Committee was forwarded to Dr. Prystowsky, he reviewed Mr. Stoller's file. The file contained records of Mr. Stoller's grades and the memoranda reporting results of previous decisions of the Promotions Committee. The file did not contain minutes of the Promotions Committee meetings, or the individual evaluations submitted by faculty members during the clinical clerkships. (U)

68. Dr. Prystowsky also met with Dr. Berlin on April 30, 1979, to permit Dr. Berlin to explain the recommendation of the Promotions Committee with respect to Mr. Stoller, and to receive Dr. Berlin's evaluation of Mr. Stoller's performance in the College of Medicine. (U)

69. On May 1, 1979, Mr. Stoller met with Dr. Prystowsky. (U)

70. At that meeting, Dr. Prystowsky read the recommendation of Promotions Committee II to Mr. Stoller and asked Mr. Stoller if he (Mr. Stoller) "could help" Dr. Prystowsky "understand the reasons for that recommendation." (U)

71. Mr. Stoller reviewed the evaluations and grades he had received in surgery and pediatrics with Dr. Prystowsky and objected to having received the failing grades that were assigned. (U)

72. Mr. Stoller felt that he had an opportunity to explain to the Dean those points that Mr. Stoller felt were important for the Dean to know before making a decision, with the exception of the points raised subsequently in a letter to Dr. Prystowsky. (U)

73. In a letter also dated May 1, 1979, Mr. Stoller advised Dr. Prystowsky as follows:

I was concerned when I left you that I had not made clear a very important point. This point is that I have not regarded my performance in Medical School [as] satisfactory, for it falls short of the standards I have set for myself. I say this independent of the opinions made by others. I hope I can be given the chance to show that my earnest desire to change will bear fruit, and that given the chance to seek guidance I have thus far been without, I can be the kind of physician that as a colleague would make you proud.

Sincerely,

/s/ Kenneth Paul Stoller (U)

74. Based upon Dr. Prystowsky's evaluation of Mr. Stoller's student file, the recommendation of the Promotions Committee and his meetings with Mr. Stoller and Dr. Berlin, Dr. Prystowsky made the decision to terminate Mr. Stoller for academic reasons. (U)

75. By letter dated May 4, 1979, Dr. Prystowsky advised Mr. Stoller as follows:

I have received and read the recommendation from the promotions committee (years III and IV). I have reviewed your record and have met with you.

You are dismissed as a student from the Pennsylvania State University College of Medicine for academic reasons. (U)

76. Mr. Stoller had an opportunity before the Promotions Committee and Dean Prystowsky to present any reasons for his poor academic performance and to provide information which might have permitted the committee to conclude that his performance in the future would be satisfactory.

77. By letter of May 5, 1979, Mr. Stoller requested that the dismissal be recorded as a resignation. (U)

78. By letter dated May 15, 1979, Dr. Prystowsky denied Mr. Stoller's request to resign rather than be dismissed. (U)

79. In a letter dated May 24, 1979, to Dr. Prystowsky, Mr. Stoller requested as follows:

The purpose of this letter is to request an appeal of the decision of May 4, 1979, and whatever process that might entail. (U)

80. Following receipt of Mr. Stoller's letter, Dr. Prystowsky met with Dr. Berlin to inquire whether anything had been brought to Dr. Berlin's attention which might in any way affect the earlier termination decision, and was advised that nothing had occurred. (U)

81. Dr. Prystowsky also again reviewed Mr. Stoller's file and concluded that the termination decision should not be changed. (U)

82. By letter dated June 1, 1979, Dr. Prystowsky advised Mr. Stoller as follows:

I have received your letter of May 24, 1979, requesting an appeal of my decision to dismiss you from the College of Medicine. I have honored that appeal by reconsidering all aspects of your case. I do not wish to alter my original decision that you be dismissed from the College of Medicine for academic reasons. (U)

83. On June 5, 1979, Mr. Stoller appealed to the President of the Pennsylvania State University; no substantive response to that appeal was received. (U)

### III. Discussion.

#### A. Substantive Due Process Claim.

■ Plaintiff Stoller contends that his substantive due process right to be free from arbitrary and capricious conduct was violated by the Defendants with respect to Stoller's dismissal from the College of Medicine. As this Court held in *Ross vs. Pennsylvania State University,* 445 F.Supp. 147 (M.D.Pa.1978), a graduate student has a "property" interest in continuing his studies. In *Board of Curators of the Universi-*

*ty of Missouri vs. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court assumed that a medical student had a protected interest in pursuing a medical career and continuing his medical education. *Horowitz,* 435 U.S. at 84, 92, 98 S.Ct. at 956. *See also Mahavongsanan vs. Hall,* 529 F.2d 448 (5th Cir.1976); *Greenhill vs. Bailey,* 519 F.2d 5 (8th Cir.1975); *Gaspar vs. Bruton,* 513 F.2d 843 (10th Cir.1975).

■ Since Stoller has a constitutionally protected interest in continuing with his medical education, substantive due process requires that his medical education not be terminated for "arbitrary or capricious" reasons. *Horowitz,* 435 U.S. at 92, 98 S.Ct. at 956; *Hines vs. Rinker,* 667 F.2d 699, 703 (8th Cir.1981).

To establish such arbitrary and capricious action, the plaintiff must show there is no rational basis for the university's decision, *Greenhill vs. Bailey,* 519 F.2d 5, 10 n. 12 (8th Cir.1975), or that the decision to dismiss was motivated by bad faith or ill will unrelated to academic performance. *Gaspar vs. Bruton,* 513 F.2d 843, 845 (10th Cir.1975). *Hines,* 667 F.2d at 703.

The parties agree that the arbitrary and capricious conduct in this case, if any, relates not to the decision of the Defendants to dismiss Stoller from the College of Medicine but to the decision of Dr. Nelson to assign to Stoller a failing grade in the Pediatrics clerkship.

Stoller contends that a failing grade in the Pediatrics clerkship was arbitrary and capricious because there are no facts in the record to support such a failing grade. In particular, Stoller reasons that the grade which Dr. Nelson assigned in the Pediatrics clerkship was to be a composite of all evaluations given to Stoller by the faculty of the College of Medicine who actually observed Stoller's work. Because no member of the faculty who submitted an evaluation of Stoller's work recommended that Stoller receive a failing grade, Stoller concludes that Dr. Nelson, by giving Stoller a failing grade, had no factual basis therefor and acted arbitrarily or capriciously.

■ A review of the evidence demonstrates that there was a rational factual basis in the record to support Dr. Nelson's decision to assign to Stoller a failing grade in the Pediatrics clerkship. Stoller's Pediatrics clerkship began in January of 1979. About halfway through the first portion of the clerkship, Dr. Nelson was advised by two resident physicians that Stoller had weaknesses in his performance. Dr. Nelson advised Stoller to "redouble his efforts" during the second phase of the Pediatrics clerkship. A review of the evaluations by the Pediatrics department staff of Stoller's performance in the Pediatrics clerkship reveals that, of the six substantive evaluations submitted, three evaluators found Stoller's performance to be in the "low pass" category, indicating that Stoller's performance was below the grade of "Pass." In addition, Stoller received unsatisfactory grades in many categories from the evaluating physicians. These are set forth with particularity in the findings of fact. The negative evaluations submitted by many of the evaluators satisfy the requirement that there be a "rational" basis for Dr. Nelson's decision.

In the alternative, Stoller contends that Dr. Nelson's decision to assign Stoller a failing grade in the Pediatrics clerkship was motivated by bad faith or ill will unrelated to Stoller's performance during the Pediatrics clerkship. In particular, Stoller contends that Dr. Nelson assigned Stoller a failing grade based not on Stoller's performance during the Pediatrics clerkship but on Stoller's otherwise poor performance during the entirety of his career at the College of Medicine. During examination *by the Court,* Dr. Nelson was questioned about whether he considered matters outside Stoller's performance during the Pediatrics clerkship in computing Stoller's grade. This Court finds credible Dr. Nelson's testimony that, to the best of his ability, he did not consider matters outside of Stoller's performance in the Pediatrics clerkship in assigning to Stoller a failing grade. Given Dr. Nelson's credible testimony and the fact that there was support in the record to assign Stoller a failing grade in pediatrics, the court concludes that Dr. Nelson's decision was not motivated by bad faith or ill will.

For all of these reasons, this Court is of the view that Dr. Nelson, in assigning to Stoller a failing grade in the Pediatrics clerkship, did not act in an arbitrary or capricious manner.

**B. Procedural Due Process Claim.**

Stoller also contends that the procedures used by the Defendants leading up to the decision to dismiss Stoller from the College of Medicine constitute a violation of Stoller's procedural due process rights. The procedural due process requirements relating to termination of a student's medical education were discussed by the Supreme Court in *Horowitz.* Justice Rehnquist, writing for the majority, stated that when a student is dismissed from school for academic reasons, he is not entitled to a prior hearing. *Horowitz,* 435 U.S. at 87, n. 3, 98 S.Ct. at 953, n. 3. If this were the law, there would be no doubt that Stoller's due process rights were not violated as Stoller would not be entitled to any procedural due process.

However, there is evidence that Justice Rehnquist's view on that specific issue may not have been shared by his colleagues. This Court in *Ross,* No. 77–257, slip op. (M.D.Pa. March 20, 1978) reviewed this precise issue and found that

Two justices, Justice Marshall and Justice White, indicated that although Horowitz had received due process and had no claim, students expelled for academic reasons had a due process right to a prior hearing. Justices Blackman and Brennan concluded that because Horowitz had been accorded due process under any standard no reason existed to decide anything else. Justice Powell, in his concurrence to Justice Rehnquist's majority opinion, stated that he joined that opinion because he read it as upholding the district court's view that Horowitz was dismissed for academic deficiencies rather than for unsatisfactory personal conduct and that in these circumstances she was

accorded due process ... Nowhere in Justice Powell's concurring opinion does he indicate that he agrees with Justice Rehnquist's view that a student dismissed for academic reasons at a state university or college is not entitled to a hearing. Consequently, this Court concludes that Justice Rehnquist's belief that the due process clause does not require a hearing for dismissal for academic reasons is not the view at this time of the majority of the Supreme Court and therefore is not the law of the land. Justice Rehnquist's statement is not necessary to his decision and is dicta. *Ross,* slip op. at pp. 3–4.

In another opinion issued by this Court in *Ross,* the Court addressed the question of what process is due in the context of an academic dismissal:

Full adversary proceeding would not be required. [The plaintiff] would only have to be given an opportunity to explain the reasons for his poor scholarship and to provide any information which might lead the administration to conclude that [the plaintiff's] performance in the future would be satisfactory. *Ross vs. The Pennsylvania State University,* 445 F.Supp. 147, 153–54 (M.D.Pa.1978).

The parties agree, at least for purposes of this hearing, that the proper standard to determine whether Stoller's procedural and due process rights were violated is that set forth in *Ross,* 445 F.Supp. at 153–54.

■ The record establishes that Stoller was given exactly the kind of "informal hearing" at which he would have an opportunity to explain the reasons for his poor scholarship which this Court envisioned in *Ross.* Mr. Stoller was invited to attend a Promotions Committee meeting on Wednesday, April 26, 1979 to discuss his possible dismissal from the College of Medicine. Stoller was interviewed by the Promotions Committee, after which the Promotions Committee voted to recommend Stoller's dismissal. The recommendation of the Promotions Committee was forwarded to Dr. Prystowsky, Dean of the College of Medicine. Prior to deciding to dismiss Stoller from the College of Medicine, Prystowsky gave Stoller a second opportunity to be heard. On May 1, 1979, Stoller met with Dr. Prystowsky who asked Stoller if he could help Dr. Prystowsky "understand the reasons" for the recommendation of the Promotions Committee. Despite the fact that Dr. Prystowsky's inquiry is at the least somewhat curious, the evidence establishes that Stoller had an opportunity before both the Promotions Committee and Dr. Prystowsky to present any reasons for his poor academic performance and to provide information which might have permitted the Promotions Committee and Dr. Prystowsky to conclude that Stoller's performance in the future would be satisfactory. After Dr. Prystowsky met with Stoller, he decided to adopt the recommendation of the Promotions Committee and to dismiss Stoller from the College of Medicine. Based on Stoller's request for "an appeal", Dr. Prystowsky reconsidered the matter, but did not alter his decision. Thereafter, Stoller appealed to the President of the Pennsylvania State University, but no response to that appeal was received.

While Stoller received the "informal process" which this Court believes to be required, Stoller nonetheless contends that his due process rights were violated. In particular, Stoller contends that the right to be heard was meaningless because Stoller did not have "notice" of the allegations to which he was required to respond. The record rebuts this assertion. Stoller was first placed on academic probation in December of 1976. While on academic probation, Stoller failed biological chemistry II. At that time, Stoller was given an opportunity to be heard before the Promotions Committee. While on academic probation, Stoller had academic difficulties and marginally passed two courses. As a result of these difficulties and Stoller's performance on the final examination in Behavioral Science 503, Stoller's record was again reviewed by the Promotions Committee on March 14, 1978. Stoller was given another opportunity to be heard by the Promotions Committee. Thereafter, because Stoller had successfully completed the second year of medical school without academic difficul-

ty, he was removed from academic probation.

During Stoller's third year in medical school, he failed the Surgery clerkship. As a result of this failure, Stoller's record was reviewed anew by the promotions committee on September 25, 1978. At that time, Stoller was given an opportunity to be heard. As a result of that meeting, Stoller was placed on academic probation. Thereafter, Stoller failed the Pediatrics clerkship. On April 19, 1979, Stoller received a memorandum from the Promotions Committee informing him that because of his failure in pediatrics, the committee was considering his dismissal from the College of Medicine.

As the record establishes, at every stage of the decision making process, Stoller was informed of the nature of the proceedings against him, was given an opportunity to be heard, and was told of the outcome of those proceedings. Stated simply, it is incredible that Stoller contends he did not have adequate notice of the matters to be considered by the Promotions Committee and was not, therefore, able to respond to those matters. The only thing Stoller did not know at the Promotions Committee meeting on April 26, 1979 was the factual basis for Dr. Nelson's decision to assign to Stoller a failing grade in Pediatrics. However, because the reasons for Stoller's failing grade in Pediatrics were not directly at issue at the Promotions Committee meeting on April 26, 1979, this fact alone cannot constitute a denial of procedural due process.

For all of these reasons, this Court is of the view that the process which Stoller received with respect to his dismissal from the College of Medicine was adequate and comports with the requirements of this Court in *Ross* and the Supreme Court in *Horowitz.*

IV. Conclusions of Law.

1. Dr. Nelson's assignment to Stoller of a failing grade in the Pediatrics clerkship did not violate Stoller's substantive due process rights.

2. The procedures afforded to Stoller prior to his dismissal from the College of Medicine provided sufficient procedural due process.

3. The Defendants are not liable to Stoller.

An appropriate order will be issued.