**Morein v. Drexel University**

14

*Faye R. Cohen,* for plaintiff.
*Neil J. Hamburg,* for defendants.

## FINDINGS OF FACT

SYLVESTER, *J.,* February 1, 2000—This matter was tried from April 27, 1999 to April 29, 1999 on an action filed by the plaintiff, claiming that he was wrongfully discharged from a doctoral program at defendant Drexel University.

Having carefully reviewed the record in this matter as well as the various filings of the parties and the applicable law, the court makes the following findings of fact and conclusions of law:

(1) Plaintiff, Robert Morein, is an adult resident of the Commonwealth of Pennsylvania.

(2) Defendant Drexel University is an academic institution situated at 32nd and Chestnut Streets, Philadelphia, Pennsylvania.

(3) Defendants Constantine Papadakis, Dr. Eli Fromm, Dr. Bruce Eisenstein, Dr. Paul Kalata, and Dr. Moshe Kam all are adult individuals who are employed by defendant Drexel University.

(4) Plaintiff, having received a bachelor of science degree in 1974 from Lehigh University and a master's degree from Temple University in 1981, applied for and was accepted by defendant Drexel University in 1989 as a doctoral candidate in the field of electrical and computer engineering.

(5) Prior to being accepted into the doctoral program, the plaintiff was required to take several courses in the post-master's program in which courses he obtained a 3.8 grade point average.

(6) Plaintiff was also required to take written and oral examinations which he passed prior to his acceptance in the doctoral program.

(7) Upon being admitted into the doctoral program, plaintiff was assigned defendant Dr. Paul Kalata as his thesis supervisor and advisor.

(8) Dr. Kalata had not published any articles in his field for several years and had a poor record as a thesis supervisor.

(9) From the date of his admission in the doctoral program until his dismissal, the plaintiff was not provided with meaningful or constructive guidance with respect to his field of study which concerned noise reduction in certain types of sensors.

(10) While acting as plaintiff's thesis supervisor, defendant Kalata had a financial relationship with a private corporation, namely K-Tron Corporation.

(11) Defendant Kalata did not immediately disclose this relationship to the plaintiff even though defendant Kalata took plaintiff's work to the company with which he was financially involved and received favorable reviews of it.

(12) A dispute arose between the plaintiff and defendant Kalata over Dr. Kalata's bringing of plaintiff's work to the company with which he was associated and with respect to possible compensation for the plaintiff.

(13) On account of the poor relationship that plaintiff and defendant Kalata had, plaintiff appealed to the chairman of defendant Kalata's program, namely, defendant Dr. Moshe Kam, for the appointment of another thesis supervisor.

(14) Dr. Kam was Dr. Kalata's only successful doctoral candidate and had a close relationship with him.

(15) Despite the plaintiff's request, Dr. Kalata was not relieved as plaintiff's thesis supervisor.

(16) Rather, a committee composed of four professors, including Drs. Kalata and Kam, was formed to oversee the plaintiff's work in August of 1991 at the suggestion of Dr. Kalata.

(17) Plaintiff met infrequently with the members of the committee.

(18) The committee did not provide him with guidance or any suggestions as to how he could prepare his thesis.

(19) Approximately every six months after the committee was formed, plaintiff's work was reviewed. However, the individuals reviewing the work were not capable of understanding plaintiff's theories which were highly advanced and proposed a novel approach to the problem on which he was working.

(20) From the time of his admission into the doctoral program in 1990 until June of 1994, plaintiff did not receive any guidance as to how he should proceed with respect to the preparation of his doctoral thesis.

(21) Such assistance was first provided in June of 1994 by Professor Tretiak, who was a member of the committee assigned to supervise the plaintiff.

(22) In January of 1995, plaintiff made a presentation to the committee. It was deemed insufficient.

(23) Plaintiff was thereafter dismissed from the doctoral program by a unanimous vote of the appointed committee because he had not completed the program in five years as required by a Drexel University regulation embodied in the graduate student handbook.

## CONCLUSIONS OF LAW

(1) Trial courts are usually reluctant to interfere in disputes between students and post-secondary institutions of learning.

(2) Despite this, a student may bring a cause of action for breach of contract where the defendant college or university has breached written policies, guidelines, or procedures or has acted in an arbitrary or capricious manner.

## DISCUSSION OF LAW

This case involves a lawsuit brought by a doctoral candidate against Drexel University and certain professors assigned to counsel and guide him in his endeavor to be granted a doctoral degree. Having carefully reviewed the matter, this court has concluded that plaintiff is entitled to relief insofar as it is clear to this court that the defendants did not fulfill their contractual responsibility to educate the appellant, as the defendants violated certain written provisions of the agreement between themselves and the plaintiff and acted in an arbitrary and capricious manner with respect to the plaintiff.

This court recognizes that, as a general rule, the legal system is reluctant to intervene in disputes between an academic institution and its students. See *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 1065 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Boehm v. University of Pennsylvania School of Veterinary Medicine,* 392 Pa. Super. 502, 573 A.2d 575 (1990). In spite of this, the courts of this Commonwealth have established that suits may be brought by students against an academic institution for breach of contract. *Cavaliere v. Duff's Business Institute,* 413 Pa. Super. 357, 605 A.2d 397 (1992). In *Swartley v. Hoffner,* 734 A.2d 915 (Pa. Super. 1999), *allocatur denied*:

"Based upon the prior statements of our court, as well as the numerous learned decisions of other courts, we

now hold that the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley,* 734 A.2d at 919. (citations omitted)

The *Swartley* court further indicated that "[t]he contract between a private institution and a student is comprised of written guidelines, policies, and procedures as contained in the written material distributed to the student over the course of their enrollment in the institution." *Swartley,* 734 A.2d at 919. (citations omitted)

Instantly, a review of the record establishes beyond cavil that not only were there written guidelines, policies and procedures that defined the parties' relationship, but also that the defendants breached the standards of care and duties prescribed by these documents. For example, an excerpt from defendant Drexel's Graduate Bulletin 1986-1987 states that, "The graduate school consists of faculty members who teach and direct the scholarly activities of selected post-baccalaureate students who are pursuing advanced study." In addition, it provides that, "The personal relationship between professor and student, which arises from the dissertation, is recognized as teaching/learning of the highest order."

Instantly, the defendants unequivocally failed to meet these standards. Not only did defendant Dr. Kalata fail to provide the plaintiff the promised direction with respect to plaintiff's field of study, he failed to establish the personal relationship with the plaintiff promised by the Graduate Bulletin. In fact, instead of establishing a personal relationship with the plaintiff, Dr. Kalata, unbeknown to the plaintiff, gave the plaintiff's academic product to a company with which he had a financial re-

lationship for his own gain. Moreover, despite plaintiff's myriad pleas for assistance, Dr. Kalata ignored them, and even attempted to undermine the plaintiff's progress by influencing the members of the committee formed after the plaintiff lodged his complaints against Dr. Kalata.

The fact that in response to the plaintiff's complaints about Dr. Kalata, a committee was formed (plaintiff's exhibit 22) rather than the appointment of a new thesis supervisor, also violated the written policies of the defendant Drexel University for nowhere in the previously mentioned bulletin does it permit, allow, or even mention that such a committee might be convened. The reason, the court suggests, that the Graduate Bulletin fails to mention such a committee is that such a committee cannot provide the personal relationship between the faculty advisor and the student promised by the Graduate Bulletin. Tellingly, even if the formation of such a committee was contemplated by the Graduate Bulletin, in this case the committee was not established in good faith, insofar as Dr. Kalata was named to the committee, as was Dr. Kam, who was a close associate of Dr. Kalata and who paid deference to Dr. Kalata's judgment and decisions.

That Dr. Kalata failed to provide the plaintiff with the promised guidance is evidenced by a memo Dr. Kalata sent to the plaintiff. (Plaintiff's exhibit 28.) In that memo, Dr. Kalata clearly indicated the degree to which he had abdicated his responsibilities toward the plaintiff. His ambivalence with respect to the plaintiff's future course of research is manifestly obvious and, quite frankly, distressing to this court. Having dutifully paid his tuition, plaintiff was entitled to expect that the university, through its professors, would make certain that the courses he took and the research he engaged in would bring him

nearer to his goal, namely the receipt of a doctoral degree.

Not only did Dr. Kalata fail to provide the plaintiff with the direction and guidance promised him, but so did the committee. Despite plaintiff's repeated requests for assistance (see plaintiff's exhibits 48, 49 and 53), none was provided him, leaving him unable to complete the required course work in a timely fashion. The failure to respond to plaintiff's letters in a meaningful way was violative of the promises expressed in the Graduate Bulletin.

Finally, Drexel University breached its duty to conduct a full and impartial investigation after the plaintiff lodged his complaints with respect to Dr. Kalata. (See plaintiff's exhibit 94.) At a minimum, the university was obliged to follow the procedures set forth in the exhibit cited, and its failure to do so amounted to a breach of the contract expressed in the Graduate Bulletin.

Plaintiff is also entitled to relief because the defendants acted in bad faith and exhibited ill will toward the plaintiff when it discharged him. In the *Swartley* decision, in addition to establishing a cause of action for breach of contract based on a violation of written "guidelines, policies, and procedures," the court indicated that relief will be forthcoming when an academic decision "was motivated by bad faith or ill will unrelated to academic performance." *Swartley,* 734 A.2d at 921, quoting *Stoller v. College of Medicine, The Milton S. Hershey Medical Center,* 562 F. Supp. 403, 412 (M.D. Pa. 1983).

Instantly, it is this court's opinion that the defendants were motivated by bad faith and ill will when they expelled the plaintiff. This conclusion is based on the fact that Dr. Kalata and some of the members of the commit-

tee formed to replace Dr. Kalata lacked the training necessary to understand the nature of the research plaintiff was pursuing. In addition, Dr. Kam either refused or was unable to provide the plaintiff with the guidance he needed in his research; and, although the plaintiff made several complaints about Drs. Kalata and Kam, the university failed to address those complaints in an adequate fashion. Rather than appoint the plaintiff another thesis supervisor, Dr. Kalata was replaced by a committee that not only included him, but also Dr. Kam, a close associate of Dr. Kalata's, someone who the record shows acceded to Dr. Kalata's demands and wishes.

Perhaps the evidence that best shows that Dr. Kalata's motives were less than pure vis-à-vis the plaintiff is that establishing Dr. Kalata's financial relationship with K-Tron Corporation. Instead of focusing on the plaintiff and seeing that he make progress toward achieving his doctorate degree, Dr. Kalata appropriated the plaintiff's work and shared it with K-Tron ostensibly for both his and K-Tron's financial gain.

On account of his relationship with K-Tron Corp., Dr. Kalata should have refused to serve on the committee once it was decided to form one in response to the plaintiff's complaints about him. Not only did Dr. Kalata fail to refrain from serving on the committee, he then proceeded to influence the other members of the committee, especially Dr. Kam, a close associate of his, such that the committee was unable to impartially and objectively assess the plaintiff's work product and provide him with the guidance promised by the Graduate Bulletin. For these reasons, it is clear that the defendants did not perform as required and that the plaintiff is entitled to damages as a consequence of the defendants' breach of the agreement between them and the plaintiff.

Having found both that the defendants breached the written contract between themselves and the plaintiff, and that the defendants have acted in bad faith and exhibited ill will with respect to the plaintiff, the question of what remedy plaintiff is entitled to must be addressed. Given that this court has found that the defendants are in breach of the contract between themselves and the plaintiff, it is clear that he is entitled to the amounts he paid in tuition while working on his doctorate, as well as counsel fees. In addition, since the court has found that the defendants arbitrarily dismissed the plaintiff from the doctoral program, it is this court's view that he is entitled to reinstatement, as well as the expungement from his record, the fact of his dismissal, as well as attorney's fees. Plaintiff, however, is not entitled to both remedies, as it would be unfair to the defendants to require them to reimburse the tuition money plaintiff tendered to Drexel University *and* require it to reinstate him. Consequently, plaintiff must elect between these two remedies and advise this court and the defendants of his election, so that this court can issue an appropriate order.