**Laura Klawitter MOIRE**

v.

**TEMPLE UNIVERSITY SCHOOL OF MEDICINE and Loren H. Crabtree, Jr., M.D.**

**Civ. A. No. 82-2898.**

United States District Court, E.D. Pennsylvania.

June 18, 1985.

Gary Green, Sidkoff, Pincus & Green, P.C., Philadelphia, Pa., for plaintiff.

Helen P. Pudlin, Philadelphia, Pa., for Temple University.

Nancy J. Gellman, Philadelphia, Pa., for Crabtree.

Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Pudlin.

Conrad, Bloom, Hitchner & O'Brien, Philadelphia, Pa., for Gellman.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

### INTRODUCTION

Plaintiff Laura Klawitter, a medical school student at Temple University School of Medicine ("Temple") from February, 1977 to May 18, 1982 (now Dr. Laura Klawitter Moire), commenced this civil rights action against Temple and Loren H. Crabtree, Jr., M.D. ("Dr. Crabtree") on July 6, 1982, following her graduation from Temple. Dr. Crabtree was Director of Medical Education, Supervisor of the Clerkship Program, and Medical Director of the Young Adult Program at Horsham Clinic ("Horsham"). While in her third year (1979–80), plaintiff failed her psychiatric clerkship at Horsham. As a result of this and other failing or "conditional" grades, plaintiff failed to qualify for promotion to fourth-year status, unless and until she repeated her third year at Temple.

Challenging her psychiatric clerkship grade only, plaintiff alleged that the defendants illegally conspired against her and failed her because of her sex, in violation of 42 U.S.C. §§ 1983 and 1985 and 20 U.S.C. § 1681 (Title IX). She charged that Dr. Crabtree subjected her to sexual harassment and that his Horsham colleagues and Temple faculty members sought to protect him. Plaintiff also asserted that Temple administrators violated her Fourteenth Amendment right to due process by failing to investigate or remedy her timely complaints appropriately.

The court finds no credible evidence that Dr. Crabtree made improper sexual advances to plaintiff, nor that he and other members of the Horsham and Temple faculties conspired to discriminate illegally against her on the basis of her sex. The court also finds that Temple's decision to require plaintiff to repeat her third year was made after a careful and deliberate process that informed her of the proceedings and afforded repeated and meaningful opportunities for her to challenge the decision. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

Prior to trial, the parties stipulated to the following facts:

Plaintiff, a female, was enrolled at Temple from February, 1977 through May, 1982; in November, 1979, she was a third-year medical student.

Assignments for third-year clerkships at Temple were made by a lottery system. Plaintiff originally was scheduled to take her third-year psychiatry clerkship at Albert Einstein Medical Center—Northern Division. After learning that Horsham was offering a full-time psychiatry clerkship for third-year Temple medical students, plaintiff requested Allan Cristol, M.D., Director of the Third-Year Medical Student Program for the Temple Department of Psychiatry, to transfer her third-year psychiatry clerkship to Horsham. In accordance with plaintiff's request, Dr. Cristol made the necessary arrangements for plaintiff to take her third-year psychiatry clerkship at Horsham. Plaintiff's psychiatry clerkship at Horsham began on November 28, 1979 and ended on January 18, 1980 excluding a two-week Christmas vacation period.

During the academic year 1979–80, Dr. Crabtree's duties included supervision of Horsham's psychiatry clerkship program for third-year Temple medical students. Two other Temple medical students, Jack Ludmir and Lori Bennett, served psychiatry clerkships at Horsham with plaintiff. At a meeting on November 28, 1979 among Dr. Crabtree, plaintiff, Jack Ludmir and Lori Bennett, Dr. Crabtree explained that there were three clinical team assignments for medical students: Young Adult Program, Adult Program, and Substance Abuse Program. Plaintiff selected the Young Adult Program (of which Dr. Crabtree was Medical Director) and the other students selected other programs.

Plaintiff spent the first four weeks of her Horsham psychiatry clerkship in the Young Adult Program. Barbara Cram, Ph.D., the Clinical Coordinator of the Young Adult Program, was plaintiff's immediate supervisor.

In addition to the clinical team assignment, Horsham's psychiatry clerkship program for third-year Temple medical students included the following activities:

(a) Preception—The medical students met with physician preceptors who discussed diagnosis, interview skills, and other issues in psychiatry. There were three preceptors during plaintiff's clerkship: N. Craig Baumm, M.D., Sandra Bloom, M.D., and Paul Weir, M.D. The three medical students were scheduled to meet as a group with each preceptor once a week.

(b) Continuous Case—Dr. Crabtree met with the medical students as a group once a week. The students observed Dr. Crabtree in session with a patient; after the patient left, Dr. Crabtree and the students discussed what had occurred.

(c) Seminar—Ivan Cohen, M.D., Medical Director of the Substance Abuse and Adult Programs and Administrative Director of the Adult Building, met with the medical students as a group once a week to discuss issues related to psychopharmacology.

(d) Special Lectures—Various Horsham staff members lectured to the medical students as a group.

At some point between December 3, 1979 and December 7, 1979, Dr. Crabtree asked plaintiff to meet with him ("first private discussion"). The first private discussion took place in Dr. Crabtree's office on the second floor of the Manor House at Horsham. Dr. Crabtree and plaintiff had a second private discussion the day after the first private discussion. Dr. Crabtree and plaintiff had a third private discussion during the first three weeks of plaintiff's psychiatry clerkship at Horsham. Dr. Crabtree and plaintiff had a fourth private discussion concerning plaintiff's request to transfer to the Substance Abuse Program.

Plaintiff was transferred from the Young Adult Program to the Substance Abuse Program for the last two weeks of her Horsham psychiatry clerkship; Ms. Isla Zeh was then the Clinical Coordinator of the Substance Abuse Program and plaintiff's immediate supervisor.

During plaintiff's psychiatry clerkship at Horsham, Dr. Weir met with the Temple medical students, including plaintiff, as a group in preception sessions totaling only

three to four hours. Dr. Bloom met with the Temple medical students, including plaintiff, as a group in preception sessions totaling only four to five hours. Bijan Etemad, M.D., met with the Temple medical students, including plaintiff, as a group one time for a presentation concerning older adults and the aging process. Plaintiff also worked with one of Dr. Etemad's patients in one-on-one therapy. Dr. Etemad met with plaintiff individually on no more than two occasions.

Within the first three full weeks of plaintiff's psychiatry clerkship at Horsham, plaintiff requested and had two meetings with Dr. Cristol concerning her problems there. Plaintiff received a failing grade for her psychiatry clerkship at Horsham and a failing grade in Psychiatry. In April, 1980, following receipt of this failing grade, plaintiff met with Dr. Cristol to discuss it. In April, 1980, plaintiff also met with Hugo D. Smith, M.D., Associate Dean for Curriculum at Temple, to discuss her grade.

On June 26, 1980, the Temple Student Promotions Committee met and, *inter alia*, reviewed plaintiff's promotion. The Temple Student Promotions Committee recommended that plaintiff repeat her third year at Temple. On June 27, 1980, Associate Dean Smith spoke with plaintiff on the telephone, informed her that the Temple Student Promotions Committee had met, and reported the Committee's recommendation to her. On June 30, 1980, Associate Dean Smith met with plaintiff and discussed, *inter alia*, the June 26, 1980 Temple Student Promotions Committee meeting and recommendation and the scheduled July 2, 1980 Temple Executive Faculty meeting.

Plaintiff prepared and submitted a written statement to the Temple Executive Faculty for its July 2, 1980 meeting. On July 2, 1980, the Temple Executive Faculty met and returned plaintiff's case to the Temple Student Promotions Committee. Between July 2, 1980 and July 7, 1980, Associate Dean Smith met with plaintiff and discussed, *inter alia*, the outcome of the July 2, 1980 Temple Executive Faculty meeting and the scheduled July 7, 1980 Temple Student Promotions Committee meeting.

On July 7, 1980, the Temple Student Promotions Committee met again. Plaintiff and her chosen advocate, Dr. Batra, were present and participated in this meeting. The Temple Student Promotions Committee recommended that plaintiff be required to repeat her third year on probation. Between July 7, 1980 and July 9, 1980, Associate Dean Smith met with plaintiff and discussed, *inter alia*, the July 7, 1980 Temple Student Promotions Committee meeting and the scheduled July 9, 1980 Temple Executive Faculty meeting.

Between July 2, 1980 and July 9, 1980, Leo M. Henikoff, M.D., Dean of Temple, met with plaintiff and discussed the scheduled July 9, 1980 Temple Executive Faculty meeting. Plaintiff prepared and submitted a written statement to the Temple Executive Faculty prior to this meeting. On July 9, 1980, the Temple Executive Faculty met and, *inter alia*, considered the Temple Student Promotions Committee's recommendation relating to plaintiff.

On July 9, 1980, the Temple Executive Faculty approved the Temple Student Promotions Committee's July 7, 1980 recommendation. On July 10, 1980, Associate Dean Smith verbally informed plaintiff of the Temple Executive Faculty's decision, and on July 11, 1980, he wrote plaintiff informing her of the Temple Executive Faculty's decision and of her right to appeal that decision to Dean Henikoff. On July 15, 1980, plaintiff submitted a written appeal of her Psychiatry grade to Dean Henikoff. Dean Henikoff appointed an Ad Hoc Appeals Committee, which conducted hearings. The Ad Hoc Appeals Committee consisted of the following persons: William P. Barba, II, M.D. (Chairman); Joseph H. Baum, Ph.D.; Mary L. Cote, M.D.; Charles Shagass, M.D.; and Ethel Weinberg, M.D.

Plaintiff retained Alan Lerner, Esquire, and Jeffrey I. Pasek, Esquire, as legal counsel in connection with her appeal. Plaintiff and her attorneys met with Dr. Barba before the first meeting of the Ad

Hoc Appeals Committee to discuss, *inter alia*, the procedures of the Ad Hoc Appeals Committee. Plaintiff submitted a written statement to the Ad Hoc Appeals Committee.

The Ad Hoc Appeals Committee held meetings on August 4, 7, 13, and 14, 1980, at which plaintiff was present for all or part of the time. During its August 4, 1980 meeting, the Ad Hoc Appeals Committee and plaintiff and her counsel met with Dr. Benson and Anthony Panzetta, M.D., Chairman of the Department of Psychiatry at Temple. During its August 7, 1980 meeting, the Ad Hoc Appeals Committee, plaintiff and her counsel met with Drs. Cohen and Crabtree of Horsham. During its August 13, 1980 meeting, the Ad Hoc Appeals Committee, plaintiff and her counsel met with Drs. Cohen, Crabtree, Cram, and Etemad, Messrs. Donahue and Tremblay, and Ms. Zeh of Horsham, and Horsham's counsel. During its August 14, 1980 meeting, the Ad Hoc Appeals Committee, plaintiff and her counsel met with Associate Dean Smith.

The Ad Hoc Appeals Committee prepared a written report to Dean Henikoff dated August 14, 1980; the report recommended that plaintiff be failed in Psychiatry and required to repeat the third year. Plaintiff presented her grievances to Dean Henikoff during one or more meetings with him, and supplied him with additional materials for his review. On September 2, 1980, Dean Henikoff wrote plaintiff that he had decided to deny her appeal to change her Psychiatry grade and that plaintiff would be required to repeat the third year of medical school at Temple.

On October 3, 1980, plaintiff filed a complaint with the Office of Civil Rights of the United States Department of Education ("OCR"). In her complaint to the OCR, plaintiff alleged that she had been subjected to sexual harassment by Dr. Crabtree, Horsham, and Temple, as a result of which she was given a failing grade in her psychiatry clerkship and not promoted to the fourth year of Temple medical school. Plaintiff's complaint to the OCR was filed by her then legal counsel, Alan Lerner, Esquire, and Jeffrey I. Pasek, Esquire. According to its files, the OCR interviewed the following persons: plaintiff; Drs. Barba, Benson, Cohen, Crabtree, Cram, Cristol, Etemad, Panzetta, Smith and Weinberg; Messrs. Donahue and Tremblay; and Ms. Zeh. The OCR concluded that there was no evidence of violation of Title IX.

During her fourth year at Temple medical school, the academic year 1981–82, plaintiff participated in the National Resident Matching Program ("NRMP"). The NRMP matches fourth-year medical students with residency programs. The list of residency programs plaintiff submitted to the NRMP ranked Graduate Hospital as her first choice. Plaintiff was matched by the NRMP with a residency program in internal medicine at Graduate Hospital. Graduate Hospital is a respected institution for the training of residents in internal medicine. Plaintiff began the residency program in internal medicine at Graduate Hospital in June, 1982 after her graduation from Temple.

## DISCUSSION

The material issues are:

Whether Dr. Crabtree sexually harassed plaintiff or sanctioned a harassing environment at Horsham and whether Temple conspired with Horsham to discriminate against plaintiff on the basis of her sex;

Whether Horsham's failure to give plaintiff a passing grade was arbitrary and capricious and in retaliation for her complaint to Temple officials and whether Temple's acceptance of Horsham's grade was arbitrary and capricious;

Whether Temple's decision to require plaintiff to repeat the third year at her own expense violated her constitutional rights to due process of law under the Fourteenth Amendment;

Whether Temple is liable for breach of contract and whether either or both defendants are liable for intentional infliction of emotional distress.

### 1. *Discrimination Claim*

Plaintiff alleged that Dr. Crabtree's conduct toward her created a sexually harassing, discriminatory atmosphere at Horsham and that Horsham and Temple officials conspired to maintain such an environment in violation of her rights under the Fourteenth Amendment, 42 U.S.C. §§ 1983 and 1985, and Title IX (20 U.S.C. § 1681).

■ Under § 1983, any person or corporation acting under color of state law subjecting or causing any citizen to be deprived of any rights secured by the Constitution or laws of the United States is liable in damages to such citizen. Plaintiff's alleged deprivation is an unlawful loss of whatever Fourteenth Amendment liberty or property interest she might have in her timely promotion. Temple's actions have been held to constitute state action for purposes of 42 U.S.C. § 1983. *See University of Pittsburgh v. Krynicky*, 742 F.2d 94 (3d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). However, Dr. Crabtree was employed solely by Horsham, a private clinic, that admittedly received no federal funds, so neither he nor any Horsham employees were acting under color of state law. But if a private party acts in conspiracy with a state actor, he can be held liable under § 1983. *Adikes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Therefore, Dr. Crabtree's conduct may be actionable under § 1983 if but only if he conspired and acted jointly with Temple.

■ The success of plaintiff's § 1985(3) claim must be dependent upon the success of her underlying § 1983 claim. Section 1985(3) is restricted to conspiracies for the purpose of depriving any person or class of persons of their right to equal protection of the laws and requires that a conspiracy be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403

U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). However, § 1985(3) provides no substantive rights; "it merely provides a remedy for violation of the rights it designates." *Great American Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979).

■ Title IX (20 U.S.C. § 1681) prohibits sex discrimination in any educational program or activity receiving federal funds. *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). Since Horsham and Dr. Crabtree received no federal funds, Dr. Crabtree cannot be held liable under Title IX.[1] Temple might be liable under Title IX to the extent it condoned or ratified any invidiously discriminatory conduct of Dr. Crabtree or Horsham.

■ Plaintiff claims she was subjected to unlawful sex discrimination because she was sexually harassed at Horsham. Sexual harassment has been defined as "the unwanted imposition of sexual requirements in the context of a relationship of unequal power" such as employer and employee or professor and student. C. MacKinnon, *Sexual Harassment of Working Women* 1 (1979). Harassment of a student by tying academic advancement to submission to sexual pressures constitutes sex discrimination in education, *see Alexander v. Yale University*, 459 F.Supp. 1, 4 (D.Conn.1977), *aff'd*, 631 F.2d 178 (2d Cir. 1980), because such treatment demeans and degrades women.

Two forms of sexual harassment are often recognized: *quid pro quo* and abusive environment. *Quid pro quo* harassment occurs where specific academic or employment benefits are withheld as a means of coercing sexual favors. Harassment from abusive environment occurs where multiple incidents of offensive conduct lead to an environment violative of a victim's civil rights.[2] Here there is no allegation of

---

**1.** Even if Horsham benefited from federal funds indirectly by federal financial aid to Temple students, a benefit so limited in scope does not impose institutional obligations under Title IX.

*See Grove City*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

**2.** The Equal Employment Opportunity Commission's ("EEOC") 1980 Guidelines on Sexual

*quid pro quo* harassment; plaintiff never accused Dr. Crabtree of attempting physical contact, soliciting sexual intimacies or threatening her with failure in order to obtain sexual favors. The issue is whether plaintiff because of her sex was in a harassing or abusive environment at Horsham with Temple's tacit or explicit consent.

■ It is undisputed that almost from the moment plaintiff began her psychiatric clerkship at Horsham, its staff was concerned about the appropriateness of her behavior. In plaintiff's first contact with the Young Adult Program, she attempted to convert an exercise in which a patient was to interview plaintiff into an interview by plaintiff of that patient. Early in her clerkship, plaintiff made what Horsham staff members regarded as unsuitable remarks at several sessions, including a psychodrama, staff rounds, and a community meeting. For example, at the Young Adult Program's community meeting, the patients argued about whether to watch football on television. Although the meeting was to encourage patients to work out their disagreements and develop the ability to self-govern, plaintiff interjected a solution by proposing a sign-up list. According to Dr. Cram, any member of the staff could have suggested this solution; plaintiff failed to understand the purpose of the meeting for the patients.

Following these incidents, Dr. Crabtree initiated a private meeting with plaintiff to discuss her disruptive behavior (the "first private meeting"). Both plaintiff and Dr. Crabtree agreed that he used the word "attractive" to describe plaintiff, referred in some context to staff rivalries or jealousies, and told plaintiff that she should refrain from asking many questions and keep a low profile.

But they disagreed on other aspects of this December, 1979 meeting. Beginning in August, 1980, plaintiff claimed that Dr.

Crabtree said he was attracted to her, her attractiveness was such that he could barely stand to look at her, her attractiveness caused staff jealousies, and she should keep a low profile to avoid drawing attention to herself. Dr. Crabtree agreed that he mentioned plaintiff's attractiveness, but denied that he stated he was attracted to her. He explained that he commented on plaintiff's attractiveness because, as a teacher and a psychiatrist, he felt it was important to say something supportive to any person before saying something negative. According to Dr. Crabtree, he also intended to make plaintiff more sensitive to concerns of clinical psychiatry; as part of that lesson, he thought she must be made aware of how she might be viewed by others. Dr. Crabtree explained that his reference to staff jealousies was another way of softening his criticism. He was attempting to put criticism of her performance in a softer light by explaining that the nonphysician staff members need to maintain control over aspects of the program and dislike threats to their authority by third-year medical school students.

Both plaintiff and Dr. Crabtree presented witnesses in support of their version of this first private meeting. Dr. Cristol testified that in his conversations with plaintiff immediately thereafter, she did not claim that Dr. Crabtree stated he was attracted to her nor that the hostile environment she perceived at Horsham was a result of sexual harassment or discrimination. Dr. Cristol's testimony was contradicted by that of Dr. Daniel Yellon, Assistant Professor of Anatomy at Temple, who was plaintiff's boyfriend and confidant at the time of the first private meeting. Dr. Yellon testified (without objection) that plaintiff told him that Dr. Crabtree told her he was overwhelmed by her beauty and she told this to Dr. Cristol. Plaintiff also had a conversation with Associate Dean Smith after she received her failing Psychiatry grade in

Harassment explicitly recognize these two types of harassment. *See* 29 CFR Ch. XIV, Part 1604, § 1604.11. *See generally* Note, Sexual Harassment Claims of Abusive Work Environment Under Title VII, 97 Harv.L.Rev. 1449 (1984).

Though the sexual harassment "doctrine" has generally developed in the context of Title VII, these guidelines seem equally applicable to Title IX.

April, 1980. His notes reflect that plaintiff stated that Dr. Crabtree told her he "didn't want anyone to think she was coming to his office because she was attractive." (Exhibit D–11). Plaintiff did not mention then that Dr. Crabtree said he was attracted to her nor did she refer more generally to any sexually motivated harassment.

Plaintiff's early formal statements also made no mention of sexual harassment. Her first written report of the incident was a statement prepared for the first Executive Faculty meeting on July 2, 1980 (Exhibit P–62). In that statement she wrote:

Dr. Crabtree called me into his office during the first week of my rotation and told me how attractive I was and how he detested students that ask too many questions during conferences. He said that students are reinforced to ask questions so that their superiors can show off their knowledge and ordered me not to speak at any group sessions or department conferences. He then commented again on how attractive I was, and how I should not think he had any ulterior motives, only that he was concerned about staff jealousies.

This statement supports Dr. Crabtree's version of the conversation. Plaintiff did not then mention that Dr. Crabtree said he was "attracted to her;" she stated that he discussed staff jealousies in the context of disliking students who were assertive.

At the second Student Promotions Committee meeting on July 7, 1980, Ethel Weinberg, M.D., asked plaintiff directly whether she had ever been sexually harassed at Horsham and plaintiff replied "no." In her statement to the July 9, 1980 Executive Faculty meeting (Exhibit P–63), plaintiff did refer to harassment but only in referring to Dr. Crabtree's order not to speak for the duration of her clerkship.

It was when plaintiff prepared her August, 1980 statement to the Ad Hoc Appeals Committee, after engaging lawyers on her behalf, that she reported Dr. Crabtree had made explicit sexual remarks. In this statement, she described their conversation as follows:

He said he wouldn't want anyone to think I had come to his office because he was attracted to me. I said, "Why would anyone think that?" He said, "Because I am." He also said that I was so beautiful that he could barely stand to look at me. I was very upset by this and don't recall all of the details of what was said at this point. I do recall crying. Dr. Crabtree also said he was concerned about "staff jealousies." He made some comment about my asking questions. I told him that people had always found my questions helpful. He responded that the only reason that my superiors encouraged me to ask questions was so they could show off their knowledge.

In contrast to plaintiff's statements, Dr. Crabtree's explanation has been consistent and corroborated by Dr. Cristol, Associate Dean Smith and plaintiff herself. Furthermore, Dr. Crabtree's behavior subsequent to their first private meeting, even as reported by plaintiff, belied her contention that Dr. Crabtree was deeply attracted to her. She testified that the first private meeting with Dr. Crabtree upset her, particularly his references to her attractiveness and staff jealousies, and after discussing it with her boyfriend and others, she approached Dr. Crabtree the next day and asked him to clarify what he had said the day before. She reported he just told her to forget that he used those words and to focus instead on his message: to refrain from interrupting staff or patient meetings. It was uncontested that Dr. Crabtree, after the first or second private meeting, asked the Director of the Temple Medical Student Program, Dr. Cristol, to transfer her from Horsham but Dr. Cristol requested that she be permitted to continue there.

Plaintiff also testified that Dr. Crabtree never made any sexual advances nor praised her in any way during the remainder of her clerkship. On the contrary, their subsequent contacts were confrontational. Dr. Crabtree received a report that at a Young Adult patients meeting called by Dr. Cram plaintiff had interrupted in an

inappropriate way. Sexual and hostile conduct by the patients had been occurring; at the meeting, Dr. Cram told the patients that there was to be no sex, no drugs, and no violent conduct at Horsham. Plaintiff then interjected a query as to whether masturbation was permitted. As even she admitted, this led to giggles from the group and undermined Dr. Cram's message. Thereafter, Dr. Crabtree issued a so-called "gag order" that she refrain from all questions or comments in group sessions.[3]

Plaintiff saw Dr. Crabtree again when she requested transfer to another unit. He told her she could spend the final weeks of her clerkship in the Substance Abuse Unit, but that his "gag order" would apply there as well. Their final contact during the clerkship was on plaintiff's last day. At lunch with the students, Dr. Crabtree told a story about an incompetent physician; plaintiff believed his remarks were directed towards her.

Based on the appearance and demeanor of all the witnesses, their bias or interest in the outcome, the inherent consistency of their testimony in the circumstances, as well as their contemporaneous actions and writings, the court finds that plaintiff's trial version of the first private meeting with Dr. Crabtree lacked credibility. Her inconsistency may not necessarily have resulted from intentional misstatement but from her admitted inability correctly to perceive men's attitudes and intentions toward her. She testified that while a second-year medical school student, she was in therapy at the Eastern Psychiatric Institute in part because she knew her attitude toward her physical features and attractiveness was naive. She testified that ever since her high school years, she has had trouble discerning when men were "making a pass" at her and when they were just being friendly or complimentary. This confusion

was evident in her response to Dr. Crabtree's comments and explains her being reduced to tears by what was intended as helpful criticism.

Undeniably, plaintiff was a special subject of Dr. Crabtree's attention during her clerkship. But this attention was the result of his displeasure with her clinical conduct rather than sexual attraction to her. Dr. Crabtree's overall behavior lends credence to his contention that his initial use of the word "attractive" was due only to his desire to lessen the impact of his criticism and make plaintiff aware of the clinical importance of a doctor's appearance in regard to patients' perceptions. After carefully considering the reported sequence of events and the credibility of the trial witnesses, the court finds that Dr. Crabtree used the word "attractive" in a descriptive rather than a harassing context and did not intend to suggest that he was personally attracted to plaintiff nor should he have been so misunderstood.

Telling a subordinate she was "attractive" certainly might be unprofessional, offensive or illegal in other circumstances but here Dr. Crabtree was entitled to explain that plaintiff's appearance was a factor of which she should be aware in a clinical setting. This message should not have confused her. When plaintiff provided a list of her assets as part of her first statement to the Executive Faculty, she herself listed her "attractiveness" first; she said it led to increased rapport with patients and staff. (Exhibit P–62). If plaintiff considered her physical appearance an asset as a medical student in some contexts, she should also have been willing to consider that how she appeared or presented herself to others might detract from her effectiveness as a medical student in others.[4] Such perception would have

---

**3.** Even after this "gag order," plaintiff spoke out again at a group therapy session. This session focused on a young woman patient who was facing a court hearing on drug charges. The other patients were encouraging her to fabricate a story concerning the source of her illegal drugs. Plaintiff spoke out and suggested that

she obtain a lawyer's advice; in the view of the staff therapist, Dr. Cram, a medical student had interfered with the patient's decision making process by interjecting a "staff solution."

**4.** By "appearance" the court includes not only physical features, but also mode of dress and

been helpful to her education in becoming a physician.

There is also no credible evidence that Dr. Crabtree's "gag order" was anything other than an appropriate disciplinary response. A psychiatric hospital is certainly a setting where superiors rightly wish to maintain speedy and effective discipline of its staff. *See Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 182 (3d Cir. 1985) (observing that a supervisor is entitled to hold employees to "exacting standards in many areas typically left to the individual's discretion," so long as these standards are not applied in a discriminatory manner).

Plaintiff's next contention is that Dr. Cram (who was Dr. Crabtree's wife) and other staff members at Horsham in collusion with Dr. Crabtree, instigated a harassing environment, presumably to prevent Dr. Crabtree from developing a serious relationship with plaintiff. There is no credible evidence of this; instead, the evidence proves that the environment was unfriendly as a consequence of plaintiff's disruptive behavior. Plaintiff offered no credible explanation why Dr. Cram, if jealous of a medical student, would encourage her husband, Dr. Crabtree, to meet with that student privately. As plaintiff herself testified, after their first conversation Dr. Crabtree never displayed any emotion other than anger or annoyance toward her.

Dr. Crabtree's decision first to transfer and then to fail plaintiff were inconsistent with behavior of a person driven by sexual attraction. The decisions of Dr. Crabtree, Dr. Cram, and other Horsham staff members were consistent with their sincere belief that plaintiff was not fulfilling her responsibilities as a physician-in-training. Her unsuitable comments and disruptiveness created an environment at Horsham where she may well have felt confused or

uncomfortable. But the inability of Horsham staff members to make her understand that her problems stemmed from her inappropriate, assertive behavior, especially in the Young Adult Program, did not constitute sexual harassment.

In the absence of sexual harassment at Horsham, Temple could not have either conspired or acted independently to condone or encourage such an environment. Therefore, plaintiff's claims under the Fourteenth Amendment, 42 U.S.C. §§ 1983 and 1985, and Title IX fail against both Dr. Crabtree and Temple.

### 2. *Substantive Due Process Claim*

Plaintiff next contended Temple violated her Fourteenth Amendment substantive due process rights. She claimed that Temple acted arbitrarily and capriciously in ratifying a grade from Horsham that was improperly motivated by ill will and bad faith.

In *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court considered the procedural and substantive due process claims of a dismissed medical school student. It did not decide whether Horowitz, a medical student, had a constitutionally protected liberty or property interest in pursuing her medical degree [5] or whether "academic dismissals from state institutions can be enjoined if shown to be clearly arbitrary or capricious," 435 U.S. at 91, 98 S.Ct. at 956 (citations omitted), because the Court held that, assuming the existence of a constitutionally protected interest and assuming that the courts can review an academic decision of a public educational institution under an arbitrary and capricious standard, the Court agreed with the district court

---

manner of self-presentation, sometimes referred to as "body language."

5. Horowitz, who was dismissed from medical school for academic reasons, claimed her dismissal deprived her of her Fourteenth Amendment "liberty" interest. She did not allege that

her dismissal violated a "property" interest recognized by Missouri law. 435 U.S. at 82, 98 S.Ct. at 951. The Court did not decide this issue but, in its decision, "[a]ssum[ed] the existence of a liberty or property interest," 435 U.S. at 84, 98 S.Ct. at 952.

that "no showing of arbitrary or capriciousness has been made in this case." *Id.*

In *Stoller v. College of Medicine,* 562 F.Supp. 403 (M.D.Pa.1983), *aff'd,* 727 F.2d 1101 (3d Cir.1984), the trial court found that Stoller, a medical student dismissed from school for academic reasons, had a property interest in continuing his studies and could not be dismissed for arbitrary and capricious reasons. But the *Stoller* court also found that Stoller's failing grade was rational, not motivated by "bad faith or ill will unrelated to academic performance," and therefore not assigned in an arbitrary or capricious manner. 562 F.Supp. at 412–13 (citations omitted).

If plaintiff did have a constitutionally protected liberty or property interest in continuing her studies without repeating a year,[6] we must consider whether her failing grade resulted from arbitrary or capricious conduct. Because Horsham was not a state actor, its conduct is not subject to constitutional scrutiny. However, we examine Horsham's method of grading plaintiff to determine if Temple arbitrarily and capriciously ratified a grade that it had reason to suspect was irrationally assigned or motivated by Dr. Crabtree's bad faith and ill will.

▮ Dr. Crabtree's decision that plaintiff had not satisfactorily completed her clerkship was based on a composite evaluation (Exhibit P–66) that reflected the individual evaluations of Drs. Crabtree, Cram, Weir and Cohen and Ms. Zeh. These evaluators ranked plaintiff's performance in a number of different areas as acceptable or below acceptable. From this composite, after consulting the other faculty members, Dr. Crabtree decided plaintiff deserved a failing grade. It is not our role to set grading standards for a professional school but at most to consider whether a decision to fail a student was rational and had a reasonable basis in fact in order to determine if impermissible factors were operative.[7]

▮ Plaintiff contended that her evaluations were inaccurate and arbitrary because Dr. Crabtree's "gag order" prohibited her from participating in group sessions. But plaintiff was able to talk in small sessions and ask questions privately. When plaintiff was transferred to Ms. Zeh's Substance Abuse Program, Ms. Zeh told her she would be treated as any other student with regard to participation; this meant that plaintiff, a new staff member, should keep a low profile in community meetings. Otherwise, she was permitted to speak freely while in the Substance Abuse Program and Ms. Zeh arranged special private meetings with plaintiff to instruct her.

The purpose of the "gag order" was to protect patients from plaintiff's disruptive comments; at a hospital, it was reasonable that concern for patient welfare outweighed a student's desire to express herself. There was ample opportunity to evaluate plaintiff's performance.

Plaintiff also argued that her composite evaluation demonstrated that roughly half of her work was at an acceptable level so that it was arbitrary and capricious for Dr. Crabtree to assign her a failing grade. But Dr. Crabtree as supervisor of the clerkship program could reasonably determine that her record reflected an inadequate overall performance under Horsham standards; he had the right to maintain Horsham's standards of clinical competency. It was reasonable for Dr. Crabtree to conclude that a student ranked as below acceptable in over half of the required clini-

---

6. In *Horowitz, Stoller* and *Ross v. Pennsylvania State University,* 445 F.Supp. 147 (M.D.Pa.1978) (cited in *Stoller* ), the disciplined medical school students were permanently dismissed from the institutions they had attended. In contrast, Moire was only required to repeat one year.

7. In *Horowitz,* the Supreme Court plurality opinion stated that academic grades are generally unsuitable for judicial review because grading involves "an expert evaluation of cumulative information." 435 U.S. at 90, 98 S.Ct. at 955. But grades may be reviewable to the extent necessary to determine whether impermissible

cal skills should not pass a Horsham clerkship.[8]

Plaintiff's performance provided a sufficient basis for her clinical grade. From the time she came to Horsham, she misconstrued her role. In addition to the incidents described earlier, plaintiff admittedly identified with the young adult patients and even asked permission to invite a young woman patient to spend the night with her. While she attempted to develop good patient relations, she proved incapable of exercising professional judgment and detachment in that clinical environment. Perhaps having been in therapy the prior year gave her a particularly strong feeling of identification; whatever the explanation for her behavior and Horsham staff reaction to it, it is clear that the Horsham staff could rationally find plaintiff's conduct and attitude did not merit a passing grade.[9]

There is no evidence that Horsham failed plaintiff in retaliation for her complaints to Dr. Cristol about her experiences at Horsham. If the Horsham faculty had truly been concerned that plaintiff's outbursts against them would affect Horsham's relationship with Temple, they would more likely have passed her than failed her.

Temple's acceptance of plaintiff's grade from Horsham was not arbitrary or capricious. In authorizing Horsham to train Temple medical students, Temple found Horsham's staff, after proper investigation and evaluation, able to instruct and evaluate students. When Dr. Cristol learned that Horsham found plaintiff's performance unsatisfactory, it was reasonable for him to rely on that evaluation for the clinical portion of her Psychiatry grade.

Plaintiff's reports to Dr. Cristol of events at Horsham did not change the reasonableness of this reliance. During her clerkship, plaintiff had discussed her prob-

lems at Horsham with Dr. Cristol but she had not made any allegations of harassment or impropriety. Dr. Cristol had also spoken to Dr. Crabtree during her clerkship and believed that the Horsham staff was properly concerned with perceived deficiencies in plaintiff's clinical behavior. Dr. Cristol was also aware that, with his permission, plaintiff had been transferred to the Substance Abuse Program so that she was not under the supervision of Dr. Crabtree or Dr. Cram for the final portion of her clerkship. Dr. Cristol could reasonably believe that pure personality conflicts were not the reason for plaintiff's unsatisfactory Horsham grade. Although she passed the written Psychiatry examination, the clinical grade was given greater weight, so that her overall performance was unsatisfactory. Her clinical grade in Psychiatry was weighted no more heavily than that of other students.

When plaintiff received her failing grade in Psychiatry, she complained that it was unfair to both Dr. Cristol and Associate Dean Smith. Their decision not to change the grade was neither arbitrary nor capricious. Faculty and administrators are accustomed to receiving numerous complaints from students who receive grades lower than they feel they deserve. Associate Dean Smith consulted with Dr. Cristol about plaintiff's performance but, assured by Dr. Cristol that he was familiar with Horsham's evaluation and that it appeared justifiable, reasonably decided to do no more. Plaintiff believed most negative evaluations she received were unwarranted. She testified that in addition to her Psychiatry grade, she thought that her unsatisfactory grades in both Medicine and Systems Disease were unfair and that her complaints of bias received unfair consideration. This court finds the Horsham fail-

discriminatory or irrational factors entered into the grading decision.

8. Plaintiff proffered no evidence that any other student with a similar composite evaluation was awarded a passing grade.

9. Plaintiff did well when repeating her psychiatry clerkship as a fourth-year student but this is

of little relevance because of the difference in circumstances. Her second clerkship was on a Temple psychiatric ward occupied mostly by elderly, urban, poor with whom she could relate quite differently. Her success or lack of it as a resident at Graduate Hospital following her graduation is too long after and too dissimilar to her Horsham clerkship be of any relevance.

ing grade was not arbitrary or capricious and Temple's ratification of this grade was not in violation of any right of plaintiff to substantive due process.

### 3. *Procedural Due Process*

■ Plaintiff also claimed that her right to procedural due process under the Fourteenth Amendment was violated by Temple because she was not provided with a full and fair hearing regarding her promotion; this claim is against Temple only because only Temple acted under color of state law and was obligated to provide her with any Fourteenth Amendment rights.

Promotions at Temple were based on a point system. According to the published Promotional Guidelines in effect in 1979–80, students completing their third year of medical school needed at least 66 points for full promotion and at least 49 points for promotion contingent on successfully completing a re-examination or other requirement. Students receiving 38–48 points were required to repeat the year and those with fewer than 37 points were subject to dismissal (Exhibit D–15).[10] The Promotional Guidelines stated that exceptions should be made only in cases of extenuating circumstances. During the period 1976–80, there had been no exceptions made.

Plaintiff had only 46 promotional points because she had not passed four third-year courses. In addition to failing her psychiatric clerkship, plaintiff had received three grades of "Condition."[11] Under the Promotional Guidelines, she was required to repeat the year. (Exhibit D–16).

In deciding whether to apply the Promotional Guidelines to plaintiff, Temple provided plaintiff with both adequate notice and opportunity to be heard. On June 26, 1980, the Student Promotions Committee met to review the records of students who were deficient in promotional points.

The Committee determined after discussion of plaintiff's record that there was no evidence of any unusual extenuating circumstances and recommended that she repeat her third year. The Student Promotions Committee also recommended an Administrative Psychiatric Interview. Associate Dean Smith then informed plaintiff of the Student Promotions Committee recommendation and told her the Executive Faculty would decide whether to accept this recommendation at its July 2, 1980 meeting. Plaintiff was advised she could explain her position to the Executive Faculty in writing and also that a psychiatric interview might be helpful to her.

In a letter prepared for this first Executive Faculty meeting (July 2, 1980), plaintiff stated she planned to follow the suggestion for a psychiatric interview and did not complain of harassment. (Exhibit P–62). The Executive Faculty decided that after her psychiatric interview, the Student Promotions Committee should review plaintiff's case again with her present. Prior to the second Student Promotions Committee meeting, Associate Dean Smith contacted several additional Horsham staff members (Drs. Baum, Bloom and Etemad), at plaintiff's request, for their evaluations of plaintiff. At the second Student Promotions Committee meeting held on July 7, 1980, plaintiff was present together with her chosen faculty advisor, Dr. Batra. The Student Promotions Committee considered Associate Dean Smith's notes from his conversations with Drs. Bloom, Baum and Etemad and Dr. Panzetta's report of his psychiatric interview. At this meeting when Dr. Weinberg asked plaintiff directly if she was complaining of sexual harassment, plaintiff replied that she was not.

The Student Promotions Committee voted after plaintiff left the meeting. The Committee first considered a motion to

---

**10.** There has been no contention that these Promotional Guidelines were inherently unfair or discriminatory.

**11.** According to the Promotional Guidelines, the "Condition" grade "denote[s] a performance not equal to the usual acceptable standard." (Ex-

hibit D–15). If this grade is "cleared" (for example, by satisfactory re-examination or repetition of clerkship), the condition grade will be purged from a student's transcript. If a condition grade is not cleared, it becomes a final grade of Fail recorded on the transcript.

make an exception to the Promotion Guidelines and permit plaintiff to retake those clerkships and exams she had not passed because there "appeared to be a number of items in the evaluation reports on this student suggesting possible interpersonal clashes and thus the overall status of her performance appeared to be too borderline to require a repeat year without further evaluation." (Exhibit P–23; Minutes of the July 7, 1980 Student Promotions Committee Meeting). The Committee defeated this motion 3–2, with Associate Dean Smith breaking a tie vote. The Committee then voted 3–2 (again with Associate Dean Smith breaking a tie) that plaintiff should repeat her third year. The Executive Faculty considered another letter from plaintiff before it acted on the recommendation of the Student Promotions Committee. The Executive Faculty voted (Associate Dean Smith abstaining) on July 9, 1980 to accept the recommendation of the Student Promotions Committee and informed plaintiff of its decision by mail.

Plaintiff then appealed to Medical School Dean Henikoff in accordance with the procedures set forth in the Promotional Guidelines. In her appeal, she requested that an appeals committee reconsider her Psychiatry grade because of the "conditional environment [she] was attempting to function in." (Exhibit P–61). She retained counsel to represent her before a special Ad Hoc Appeals Committee; her prepared statement for this committee alleged sexual harassment for the first time.

The Ad Hoc Appeals Committee met on four occasions, interviewed numerous people from Temple and Horsham, and ultimately affirmed the denial of promotion. Plaintiff then appealed to Dean Henikoff who, after considering the record and evidence, affirmed the Ad Hoc Appeals Committee's decision.

Plaintiff's claim that she should not have been required to repeat the third year was given careful consideration by numerous committees; she was informed at every stage of proceedings, allowed to make statements on her behalf, and permitted to have the assistance of first, a faculty advisor and, later, legal counsel.

The Supreme Court has considered the due process rights of students at public or state operated educational institutions in two recent opinions. In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) it was held that prior to a disciplinary suspension a public school student has a due process right to "some kind of notice and ... some kind of hearing." 419 U.S. at 579, 95 S.Ct. at 738. In *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Court, considering the due process rights of a student facing dismissal from a state medical school for academic reasons, held that, assuming the existence of a protected liberty or property interest, plaintiff had received all the due process to which she was entitled because Horowitz had been fully informed of the faculty's dissatisfaction with her progress and its possible consequences; the faculty decision to dismiss her was "careful and deliberate." 435 U.S. at 85, 98 S.Ct. at 952. But Justice Rehnquist also stated in *dictum* that prior to a dismissal for academic rather than disciplinary reasons no hearing at all is required. In his view, an academic judgment "is by its nature ... subjective and evaluative," 435 U.S. at 90, 98 S.Ct. at 955, and, in contrast to disciplinary factfinding, not necessarily aided by a hearing at which the student's version might be presented. Justice Rehnquist's Opinion extended this principle from an academic grade to an academic dismissal.

> Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making.

435 U.S. at 90, 98 S.Ct. at 955. Justice Rehnquist was joined by only three Justices in the Opinion of the Court, but Justice Powell's concurrence agreed with Justice Rehnquist's differentiation between

disciplinary and academic proceedings and also agreed that Horowitz was dismissed for academic reasons.

However, the Rehnquist *dictum* is not binding. Even if it were, it would be unnecessary to decide if the Temple decision requiring plaintiff to repeat the third year would be considered a purely academic dismissal by a Supreme Court majority,[12] because here, as in *Horowitz*, the plaintiff received whatever process might have been due her.

The Temple faculty did make a subjective and cumulative academic evaluation of plaintiff's academic and clinical competency after accepting her psychiatric grade as deserved. All her other grades, satisfactory and unsatisfactory, were considered in this evaluation of her academic performance. But Temple's actual decision concerning plaintiff's promotion was purportedly made in accordance with Promotional Standards of general applicability to all students. A decision based on established standards requires less subjectivity and expertise than individual grading decisions or their cumulative effect so that such an adverse decision might well require the due process protections imposed by *Goss v. Lopez*, that is, some kind of notice and informal hearing prior to the adverse action in order to permit the student to offer extenuating circumstances. But even applying this more stringent standard to Temple's promotional procedures, Temple provided plaintiff with more due process than *Goss v. Lopez* held the Fourteenth Amendment requires.

*Goss v. Lopez* considered disciplinary suspensions of no more than ten days' duration and explicitly held that for short suspensions the rights of confrontation and counsel are not required. 419 U.S. at 583, 95 S.Ct. at 740. The Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or perma-

nently, may require more formal procedures." 419 U.S. at 584, 95 S.Ct. at 741. If requiring plaintiff to repeat a year is viewed as comparable to a long suspension, Temple met this more rigorous standard since it permitted plaintiff to have counsel and the opportunity to offer witnesses on her behalf. Temple provided plaintiff with far more due process than was required in *Horowitz* even though Temple was considering a less stringent sanction, repetition of one year, rather than dismissal from school altogether as was the case in *Horowitz*.

█   Plaintiff's contention that she was denied due process is based not on a claim that Temple lacked sufficient procedure, but that its procedures were tainted by bias in their application. First, she claimed that the Temple committees were biased against her because Associate Dean Smith voted on the Student Promotions Committee and Dr. Weinberg sat on the Ad Hoc Appeals Committee. Due process is a concept that varies depending on the character of the proceeding involved. *See* Friendly, "Some Kind of Hearing," 123 U.Penn.L.Rev. 1267 (1975). Whatever due process is required in a school setting need not be formal and adversarial. *See Goss v. Lopez*, 419 U.S. 565, 584, 95 S.Ct. 729, 741, 42 L.Ed.2d 725 (1975) (holding due process satisfied by "informal give-and-take between student and disciplinarian ...."). The indices of impartiality required of a court and jury are not required of an academic institution. The Temple faculty was deciding whether to promote plaintiff or require her to repeat a year; dismissal from medical school was never under consideration. It was reasonable for plaintiff's case to be considered by faculty members familiar with her record. It is a mistake to require persons whose expertise is in other areas to function like lawyers in their professional activities, even if the consequences of their conduct is serious. There is no reason to believe Tem-

---

**12.** Another court in this Circuit has found the *Horowitz dictum* not binding. In *Ross v. The Pennsylvania State University*, 445 F.Supp. 147 (M.D.Pa.1978), the trial court found that Justice Powell did not specifically endorse Justice Rehnquist's Opinion, so that a Supreme Court

majority has not adopted the view that no due process is required prior to an academic dismissal. *Id.* at 157. In a subsequent case in that district, the parties agreed that the *Ross* standard would govern their action. *See Stoller*, 562 F.Supp. at 414.

ple officials were predisposed against plaintiff or improperly motivated by institutional considerations regarding Horsham.

Plaintiff also claimed that the Ad Hoc Appeals Committee denied her constitutional rights because it did not interview all witnesses who might have provided favorable reports of her behavior at Horsham. For some reason, plaintiff and her counsel did not ask that the Appeals Committee hold another meeting to hear from other witnesses; it was her responsibility to bring to the Appeals Committee's attention any missing information she thought beneficial to her or request any additional procedural steps required.

█ Finally, plaintiff contended that Temple failed to follow its own Promotional Guidelines regarding procedure and that this violated her due process rights.[13] Temple did not fail to follow its own guidelines. But even if there were some deviations, not every deviation from an academic institution's procedures would constitute a deprivation of due process. The deviations alleged were sufficiently minor so that even if true, they would not affect the fundamental fairness of Temple's proceedings. The extensive procedural protections Temple provided to plaintiff provided whatever process was due her under the Promotion Guidelines and the Fourteenth Amendment to the Constitution.

### 4. Pendent State Claims

Plaintiff also asserted against Temple pendent state claims of breach of contract and intentional infliction of emotional distress.

█ If admission to a professional school created an implied contract, its academic requirements and the Promotional Guidelines were implied terms and plaintiff, admitted as a student when they were already in effect, was bound by them. Temple refused to promote her because she had not performed her work satisfactorily in accordance with the academic requirements of the school as determined under its Promotional Guidelines. There was no breach of contract by Temple.

█ Temple's procedure regarding plaintiff's administrative/psychiatric interview was not an intentional infliction of emotional distress. The Student Promotions Committee required such an interview for promotion of most third-year students who had fewer than 60 promotional points. See Minutes of the Student Promotions Committee Meeting, June 26, 1980 (requiring interview for three of the four third-year students with fewer than 60 promotional points). (Exhibit P–13). Plaintiff was not emotionally distressed by the administrative/psychiatric interview. She did not object; in fact, she wrote to the Executive Faculty on July 2, 1980 that she herself planned to have an administrative/psychiatric interview. There was absolutely no evidence that plaintiff went to the interview against her will or considered it inappropriate or unhelpful. Dr. Panzetta found her "very friendly and informative in [the] interview." (Exhibit P–9). Even if Temple had required this interview over her objection, it did not intend to cause her any distress. Temple's purpose was to assist the school and the medical student in confronting personality problems interfering with her progress as a medical student and prospective physician. This was a proper and privileged purpose. Plaintiff's pendent state claims against defendant Temple are denied.

Plaintiff's claim against Dr. Crabtree for intentional infliction of emotional distress fails because the court finds no credible

---

**13.** In a footnote to the plurality Opinion in *Horowitz,* Justice Rehnquist denied that the medical school violated its own rules but also doubted that it would be unconstitutional to do so. *Horowitz,* 435 U.S. at 92 n. 8, 98 S.Ct. at 956 n. 8. Justice Marshall expressed his dissatisfac-

tion with Rehnquist's "confusing dictum," 435 U.S. at 107 n. 22, 98 S.Ct. at 964 n. 22. (Marshall, J., concurring in part and dissenting in part), because "some compliance with previously established rules" might be required by the Due Process Clause." *Id.*

evidence that Dr. Crabtree acted other than appropriately in his treatment of plaintiff.

Any statement of fact in this discussion not specifically mentioned in the Findings of Fact is deemed included therein.

## CONCLUSIONS OF LAW

1. Temple University Medical School is a state actor.

2. There was no sexual or other intentional discriminatory treatment or harassment of plaintiff by defendants Temple or Dr. Crabtree.

3. If plaintiff had a constitutionally protected interest in promotion to her fourth year of medical school, plaintiff was not deprived of her Fourteenth Amendment rights.

   a. Horsham's and Temple's grading decisions were not arbitrary or capricious; plaintiff has not been deprived of any constitutionally required substantive due process.

   b. Temple afforded plaintiff at least as much procedural due process as the Fourteenth Amendment requires whether or not plaintiff's denial of promotion was based on purely academic grounds.

4. There was no breach of any contract between Temple and plaintiff.

5. Defendants did not act toward plaintiff in an extreme and outrageous manner; there was no intentional infliction of emotional distress.

Judgment will be entered accordingly.

## JUDGMENT

AND NOW, this 18th day of June, 1985, for the reasons set forth in the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that FINAL JUDGMENT is entered in favor of defendants Temple University School of Medicine and Loren H. Crabtree, Jr., M.D. and against plaintiff Laura Klawitter Moire.